UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

SEP 02 2026

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

JAWAD FAKROUNE,
also known as "Angelino Escobar,"
"Anjelino Escobar,"
"Angelo Escobar,"
"Giovanni Costello,"
"Angelo Baldini,"
"Angelo Vitale," and
"Angelo Rivera"

No. 25 CR 512

Judge Thomas M. Durkin

## PLEA AGREEMENT

1. This Plea Agreement between the United States Attorney for the Northern District of Illinois, ANDREW S. BOUTROS, and defendant JAWAD FAKROUNE, also known as "Angelino Escobar," "Anjelino Escobar," "Angelo Escobar," "Giovanni Costello," "Angelo Baldini," "Angelo Vitale," and "Angelo Rivera," and his attorneys, BROOKE STEVENS, and GLENN SEIDEN is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rules 11(c)(1)(A) and 11(c)(1)(C), as more fully set forth below. The parties to this Agreement have agreed upon the following:

## Charges in This Case

2. The second superseding indictment in this case charges defendant with tax evasion, in violation of Title 26, United States Code, Section 7201 (Counts One, Three, Nine, Sixteen, and Eighteen), willful non-filing of tax returns, in violation of Title 26, United States Code, Section 7203 (Counts Two, Four, Ten, Seventeen, and

Nineteen), and wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts Five through Eight, and Eleven through Fifteen).

3. Defendant has read the charges against him contained in the second superseding indictment, and those charges have been fully explained to him by his attorneys.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charges to Which Defendant Is Pleading Guilty

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following counts of the second superseding indictment: Count Five, which charges defendant with wire fraud, in violation of Title 18, United States Code, Section 1343, and Count Nine, which charges defendant with tax evasion, in violation of Title 26, United States Code, Section 7201. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

## Factual Basis

6. Defendant will plead guilty because he is in fact guilty of the charges contained in Counts Five and Nine of the second superseding indictment. In pleading guilty, defendant admits the following facts, and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline § 1B1.3, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

a. With respect to Count Five of the second superseding indictment:

Defendant JAWAD FAKROUNE was a Moroccan national who entered the United States from Morocco by way of New York, New York on or about September 17, 2001. FAKROUNE entered the United States on a visa as part of the Diversity Visa Program. In or around 2007 or 2008, FAKROUNE began using pseudonyms. Beginning no later than in or around 2018, FAKROUNE began using, among others, the pseudonyms "Angelino Escobar," "Anjelino Escobar," "Angelo Escobar," "Giovanni Costello," "Angelo Baldini," "Angelo Vitale," and "Angelo Rivera," which names were not associated with any legitimate Social Security number in FAKROUNE's name.

In or around 2022, FAKROUNE, using the name "Angelino Escobar," met and became an acquaintance of Individual E, a professional basketball player. Beginning no later than in or around 2022, and continuing through in or around October 2024, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, FAKROUNE knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money and property from Individual E by means of materially false and fraudulent pretenses, representations, and promises.

As part of the scheme, in or around the summer of 2022, FAKROUNE fraudulently obtained approximately $2,450,000 from Individual E through false representations and promises that FAKROUNE would invest the money on Individual E's behalf in a business involving shipping containers and a marijuana grow operation in California. To obtain the money from Individual E, FAKROUNE falsely represented and promised to Individual E that Individual E would receive a monthly return on his

investment and could redeem his investment at any time. Based on FAKROUNE's representations about: (1) investing the money in a business involving shipping containers and a marijuana grow operation; (2) a monthly return on investment; and (3) Individual E's ability to redeem his investment at any time, Individual E agreed to provide FAKROUNE with $2,450,000 for purposes of the purported investment into the business ventures. As part of the purported investment, FAKROUNE caused Individual E to transmit the $2,450,000, via two wire transfers, to a bank account in the name of Individual F.

Rather than invest the money that Individual E transmitted to Individual F in a business involving shipping containers and a marijuana grow operation, FAKROUNE used Individual E's money for FAKROUNE's personal purposes, including, among other things, payment towards the purchase of a residence located at 16011, 16031, and 16055 135th Street, Lemont, Illinois (the "Lemont Residence"), to pay rent for a residence in New York City, New York (the "New York Residence"), to fund restaurant outings and shopping at designer stores in New York City, to purchase a 2022 Cadillac Escalade for the benefit of Individual G, and to purchase designer watches for various individuals.

FAKROUNE acknowledges that his false representations about investing all of Individual E's money in a business involving shipping containers and a marijuana grow operation, Individual E's receipt of a monthly return on investment, and Individual E's ability to redeem his investment at any time were material to Individual E's decision to invest the $2,450,000 with FAKROUNE.

On or about July 29, 2022, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, FAKROUNE, for the purpose of executing the scheme, knowingly caused to be transmitted by means of a wire communication in interstate commerce certain writings, signs, and signals, namely, an interstate wire transfer processed through the Federal Reserve System in the amount of approximately $1,000,000 from a bank account at City National Bank ending in 0111 associated with Individual E to a Bank of America account ending in 4203 associated with Individual F.

b. With respect to Count Nine of the second superseding indictment:

*The Internal Revenue Service*

The Internal Revenue Service ("IRS") was part of the United States Department of the Treasury and, among other things, was responsible for administering the tax laws of the United States and collecting taxes from individuals and entities. Individual taxpayers were required to file an annual United States Individual Tax Return, Form 1040, including schedules and attachments, with the Internal Revenue Service by a date certain, if the individual's gross income exceeded certain specified amounts. If a taxpayer failed to accurately report or pay his or her tax liability, the IRS could calculate, assess, and attempt to collect the correct tax liability.

*FAKROUNE's Filing and Non-Filing of Individual Income Tax Returns*

On or about March 25, 2002, FAKROUNE filed a United States Individual Tax Return, Form 1040 for the 2001 tax year. Despite receiving gross income in excess of the amount required to file an income tax return and thereby being required by law to

file an income tax return (Form 1040 with schedules and attachments) following the close of calendar years 2020 through 2024, FAKROUNE willfully failed to make and file such returns at the time required by law. Throughout that period, FAKROUNE willfully attempted to evade and defeat federal income tax due and owing by him to the United States for the calendar years 2020 through 2024 through the receipt of cash and use of nominees to receive his income in order to conceal that income from the IRS.

*FAKROUNE's Receipt of Income and Attempts to Evade and Defeat Federal Income Tax Due and Owing in 2022*

Between on or about January 1, 2022, and continuing through on or about April 18, 2023, in the Northern District of Illinois, Eastern Division, FAKROUNE, did willfully attempt to evade and defeat the federal income tax due and owing by him to the United States for the calendar year 2022, by committing the following affirmative acts, among others: (i) FAKROUNE caused Individual E to wire approximately $2,450,000 to Individual F via two wire transfers; and (ii) FAKROUNE received approximately $50,000 in cash payments from Individual K as part of a purported investment in a cannabis company in San Jose, California. During FAKROUNE's dealings with Individual F about the wire transfers, Individual F and FAKROUNE discussed the need to pay taxes on the money that Individual E had wired to Individual F for the benefit of FAKROUNE.

Specifically, as set forth above, in or around the summer of 2022, FAKROUNE fraudulently obtained approximately $2,450,000 from Individual E through false representations and promises that FAKROUNE would invest the money on Individual

E's behalf in a business involving shipping containers and a marijuana grow operation in California. FAKROUNE directed Individual E to transfer the funds to a bank account associated with Individual F, which he did. FAKROUNE then used nearly all of Individual E's money for FAKROUNE's personal purposes, including, among other things, payment towards the purchase of the Lemont Residence, to pay rent for the New York Residence, to fund restaurant outings and shopping at designer stores in New York City, to purchase a 2022 Cadillac Escalade for the benefit of Individual G, and to purchase designer watches for various individuals.

In total, in the calendar year of 2022, FAKROUNE earned at least approximately $2,500,000 in income from, among other things, the fraud proceeds received from Individual E and Individual K, which fraud scheme is further discussed below. FAKROUNE did not file federal individual income tax returns for the 2022 tax year and used Individual F to conceal a portion of his income from the IRS. FAKROUNE's willful attempts to evade and defeat income tax due and owing in 2022 resulted in a loss to the IRS of approximately $914,799 and a loss to the Illinois Department of Revenue of approximately $127,862 for tax year 2022.

*FAKROUNE's Receipt of Income and Attempts to Evade and Defeat Federal Income Tax Due and Owing from 2020 through 2024*

FAKROUNE further acknowledges that he did willfully attempt to evade and defeat the federal income tax due and owing by him to the United States for the calendar years 2020, 2021, 2023, and 2024, and received income derived from multiple sources, including the fraudulent schemes set forth below.

*FAKROUNE's Fraud Scheme Involving Individual F*

Beginning no later than in or around 2021, and continuing through in or around April 2024, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, FAKROUNE knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money and property from Individual F by means of materially false and fraudulent pretenses, representations, and promises.

It was part of the scheme that FAKROUNE purported to make a $250,000 investment in gold on Individual F's behalf, and then caused Individual F to make cash payments, payments towards FAKROUNE's leases in various residences, and mortgage and tax payments for the Lemont Residence on FAKROUNE's behalf. In truth, FAKROUNE did not invest $250,000 in gold on Individual F's behalf. As part of the scheme, FAKROUNE asked Individual F if she was interested in investing in gold, and she declined. FAKROUNE then falsely represented to Individual F that he had made a $250,000 investment on her behalf and claimed that Individual F owed FAKROUNE the money that he had fronted for the investment. FAKROUNE also falsely represented to Individual F that Individual M had provided money towards the gold investment, when, in fact, Individual M did not provide any money in connection with any investment in gold with FAKROUNE.

Soon after the purported $250,000 investment, FAKROUNE caused Individual F to withdraw at least approximately $168,100 in cash from a bank account, which cash she provided to FAKROUNE as partial repayment of the purported investment. FAKROUNE also caused Individual F to make numerous $9,500 rent payments to a

landlord for FAKROUNE's rental residence in Chicago, Illinois as partial repayment of the purported investment. Between in or around October 2022, and in or around April 2024, FAKROUNE further caused Individual F to make monthly mortgage payments of approximately $6,279 and property tax payments for the Lemont Residence as partial repayment of the purported investment. As part of a scheme to defraud Individual L, discussed below, on or about May 1, 2024, FAKROUNE caused Individual L to submit a check for $138,459.24 to pay off Individual D's student loan.

*FAKROUNE's Fraud Scheme Involving Individuals H and I*

Beginning no later than in or around 2023, and continuing through in or around January 2025, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, FAKROUNE knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money and property from Individual H and Individual I by means of materially false and fraudulent pretenses, representations, and promises.

It was part of the scheme that FAKROUNE obtained approximately $150,000 from Individual H and Individual I through false representations and promises that FAKROUNE would invest the money in a coffee shop and/or Mexican restaurant, when in fact, FAKROUNE did not invest the $150,000 in a coffee shop and/or Mexican restaurant. FAKROUNE falsely represented and promised that Individual H would receive a 33% return on her investment within one year and could redeem her investment whenever she wanted. FAKROUNE falsely represented to Individual H that Individual H was one of five sets of investors in a business that would be a coffee

shop and/or Mexican restaurant and provided Individual H with a piece of paper falsely reflecting five separate silent investors in the coffee shop and/or Mexican restaurant.

FAKROUNE also falsely represented to Individual H that Individual D was an investor in the coffee shop and/or Mexican restaurant, when, in fact, Individual D did not invest in any coffee shop and/or Mexican restaurant with FAKROUNE. FAKROUNE solicited $150,000 from Individual H for the purported investment in the coffee shop and/or Mexican restaurant, and when Individual H did not have sufficient funds to invest the full $150,000 and could only invest $75,000, FAKROUNE directed Individual H to bring in another person to invest to bring the total to $150,000. Individual H told Individual I about FAKROUNE's investment and the representations that he had made and Individual I invested $75,000 based upon FAKROUNE's false representations and promises that the funds would be invested in a coffee shop and/or Mexican restaurant. FAKROUNE caused Individual H to provide him with the $150,000 purported investment on behalf of Individual H and Individual I in cash. To make the investment appear legitimate, FAKROUNE falsely represented to Individual H that he was clearing Individual H's investment through Individual F, whom FAKROUNE falsely represented to be his attorney, but who in fact was FAKROUNE's romantic partner.

On or about January 6, 2025, FAKROUNE caused Individual H to sign a lease on behalf of FAKROUNE for a residence in Michigan City, Indiana, based upon FAKROUNE's false representations and promises that, in exchange for signing the lease, FAKROUNE would double Individual H's investment money and repay her

$300,000 in connection with the coffee shop and/or Mexican restaurant investment. In fact, FAKROUNE did not repay any of the money Individual H and I provided to FAKROUNE.

*FAKROUNE's Fraud Scheme Involving Individual J*

Beginning no later than in or around 2023, and continuing through in or around January 2025, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, FAKROUNE knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money and property from Individual J by means of materially false and fraudulent pretenses, representations, and promises.

It was part of the scheme that FAKROUNE obtained a total of approximately $91,000 from Individual J through false representations and promises that FAKROUNE would invest Individual J's money in: (1) the stock market; (2) a restaurant or bodega in New York; and (3) a purported "black market" business to sell goods, when in fact, FAKROUNE did not invest Individual J's money, but rather spent the money on personal items.

In or around November 2023, in order to obtain money from Individual J, FAKROUNE falsely represented and promised Individual J that FAKROUNE would invest $30,000 of Individual J's money in the stock market along with FAKROUNE's own money. Approximately one month after the purported stock market investment, in or around December 2023, FAKROUNE falsely represented to Individual J that the $30,000 Individual J had provided had made $1,000,000 and would make tens of millions of dollars in a few years, when in fact, FAKROUNE had not invested

Individual J's money in the stock market but rather spent the $30,000 on personal items. In order to obtain another $31,000 from Individual J, FAKROUNE falsely represented and promised Individual J that he would invest $31,000 of Individual J's money in a bodega in New York City, when in fact, FAKROUNE did not invest Individual J's $31,000 in a bodega, but rather spent the $31,000 on personal items, including a luxury watch. In order to obtain another $30,000 from Individual J, FAKROUNE made false representations and promises to Individual J that he would invest Individual J's $30,000 in the "black market" to sell other goods, along with FAKROUNE's own money, when in fact, FAKROUNE did not invest Individual J's $30,000, but rather spent the $30,000 on personal items.

*FAKROUNE's Fraud Scheme Involving Individual K*

Beginning no later than in or around December 2022, and continuing through in or around 2024, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, FAKROUNE knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money and property from Individual K by means of materially false and fraudulent pretenses, representations, and promises.

It was part of the scheme that FAKROUNE obtained a total of approximately $250,000 from Individual K through false representations and promises that FAKROUNE would invest Individual K's money in: (1) a marijuana business; (2) an exotic car company; and (3) a business associated with the oil industry when in fact, FAKROUNE did not invest Individual K's money, but rather spent the money on personal items.

In or around November 2022, to obtain money from Individual K, FAKROUNE falsely represented and promised Individual K that he would invest $50,000 of Individual K's money in his cannabis company in San Jose, California. FAKROUNE falsely represented and promised Individual K that Individual K would receive millions of dollars in connection with the $50,000 investment in FAKROUNE's cannabis company. To avoid paying Individual K her money back, FAKROUNE falsely represented to Individual K that an individual in possession of her money was out of the country or in other parts of the United States and could not return the money.

In or around early 2023, to obtain additional money from Individual K, FAKROUNE falsely represented and promised Individual K that Individual K would receive millions of dollars in connection with a $50,000 investment in an exotic car rental company based out of Miami, Florida. FAKROUNE falsely represented that the exotic car rental company was associated with a "secret society," and that Individual K would receive $700,000 per year from her $50,000 investment in exotic car company. FAKROUNE also falsely represented that he had chosen Individual K over other potential investors for the investment in an exotic car rental company.

In or around December 2023, to obtain additional money from Individual K, FAKROUNE falsely represented and promised that Individual K would receive millions of dollars in connection with a $150,000 oil investment. FAKROUNE falsely represented that other individuals, including Individual M, whom FAKROUNE represented to be his daughter, but was in fact a romantic partner, were a part of the oil investment.

FAKROUNE also caused Individual K to pay for his credit card bills with false promises of repayment at a profit. Specifically, FAKROUNE caused Individual K to obtain a credit card in the name of "Angelino Escobar" associated with Company B and falsely represented and promised to Individual K that if Individual K paid off the credit card bills, she would receive millions of dollars from a "secret society." As a result, Individual K paid thousands of dollars of credit card bills for expenditures incurred by FAKROUNE.

In truth, FAKROUNE did not invest Individual K's $250,000 as he represented that he would, falsely represented that Individual K would receive profit or repayment for paying for FAKROUNE's credit card bills, and instead retained Individual K's funds for his own personal use.

*FAKROUNE's Fraud Scheme Involving Individual L*

Beginning no later than in or around April 2024, and continuing through in or around 2025, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, FAKROUNE knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money and property from Individual L by means of materially false and fraudulent pretenses, representations, and promises.

It was part of the scheme that FAKROUNE obtained or caused to Individual L to make payments totaling approximately $2,850,718.62 in connection with a purported investment in a marijuana business, when, in truth FAKROUNE used the funds to, among other things, set up a $1 million loan to Company B repayable to FAKROUNE in $20,000 weekly cash payments, to pay the remaining balance for his mortgage for

the Lemont Residence, and to pay the remaining balance for Individual F's student loans.

As part of the scheme, FAKROUNE falsely represented to Individual L that he ran a licensed marijuana operation in California and asked if Individual L wanted to invest $3 million with him in exchange for a 30% return after three months with the ability for Individual L to redeem her investment at any time. FAKROUNE also falsely represented that, as security for the investment, he would have his purported attorney, Individual F, put the Lemont Residence in Individual L's name. FAKROUNE also falsely represented that the Lemont Residence was free of a mortgage, when, in truth, he used approximately $645,259.38 of Individual L's money obtained as part of the scheme to pay off the remaining mortgage for the Lemont Residence.

In order to make the investment appear legitimate, FAKROUNE showed Individual L marijuana packaging, which he claimed derived from his marijuana grow operation. FAKROUNE also staged phone calls with purported investors in the marijuana grow operation to make it appear to Individual L that she had invested in a marijuana company. By way of example, during a FaceTime call between FAKROUNE and Individual L, FAKROUNE falsely represented that his mother was on speakerphone using a second phone, and then discussed the marijuana investment with that woman, reaffirming that Individual L would get a 30% return on her investment and that he intended to marry Individual L. In truth, the woman on the phone call was not FAKROUNE's mother.

As part of the scheme, FAKROUNE caused Individual L to obtain two cashier's checks for $500,000 each, which checks were made out to Company B. While FAKROUNE falsely represented that he owned Company B and that the $1 million in checks were part of the investment, in truth, FAKROUNE delivered the checks to Individual G as part of a loan to Company B and caused Individual G and others acting at Individual G's direction to make $20,000 weekly cash payments to FAKROUNE, which proceeds he kept for himself. FAKROUNE further caused Individual L to draft a check in the amount of $645,259.38 to Citizens Bank, and $138,459.25 to Aidvantage, a federal student loan processor, to pay the remaining balance of Individual F's student loan balance. FAKROUNE falsely represented that these payments were to investors in the marijuana business and that those payments, among others, constituted payments towards Individual L's $3 million investment. In total, Individual L provided $2,850,718.62 in cash and payments made at FAKROUNE's direction as part of the purported investment. FAKROUNE did not invest Individual L's money in a marijuana business. Beginning in the fall of 2024, Individual L repeatedly asked FAKROUNE for her money back, which he did not provide. FAKROUNE never put the Lemont Residence in Individual L's name.

In or around the fall of 2024, a federal grand jury was investigating FAKROUNE's financial activity. As part of that investigation, in or around June 2025, law enforcement officials with the FBI and IRS interviewed Individual L regarding her financial dealings with FAKROUNE. Prior to that interview, Individual L had spoken with FAKROUNE, who directed her to falsely represent that the $1 million provided to

Company B was a bridge loan, and that she had been paid back. During the interview, Individual L provided law enforcement officials with the false information that FAKROUNE had instructed her to give.

*FAKROUNE's Income and Tax Due and Owing*

FAKROUNE acknowledges that, in total, FAKROUNE earned at least approximately the amounts of income reflected below in the applicable calendar year and resulted in tax and owing to the IRS and the Illinois Department of Revenue ("IDOR") in the amounts set forth below:

| Year | Income | Loss to IRS | Loss to IDOR |
|---|---|---|---|
| 2020 | $986,801 | $324,955 | $48,732 |
| 2021 | $1,507,100 | $517,056 | $74,484 |
| 2022 | $2,585,500 | $914,799 | $127,862 |
| 2023 | $245,000 | $52,800 | $12,007 |
| 2024 | $3,046,718.62 | $1,080,072 | $150,675 |
| Total | $8,371,119.62 | $2,895,084 | $413,760 |

**Maximum Statutory Penalties**

7. Defendant understands that the charges to which he is pleading guilty carry the following statutory penalties:

a. Count Five carries a maximum sentence of 20 years' imprisonment. Count Five also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater. Defendant further understands

that with respect to Count Five, the judge also may impose a term of supervised release of not more than three years.

b. Count Nine carries a maximum sentence of 5 years' imprisonment. Count Nine also carries a maximum fine of $250,000. Defendant further understands that the Court must order costs of prosecution, estimated not to exceed $500. Defendant further understands that with respect to Count Nine the judge also may impose a term of supervised release of not more than three years.

c. Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court. The Court also may order restitution to any persons as agreed by the parties.

d. Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty or restitution imposed.

e. Therefore, under the counts to which defendant is pleading guilty, the total maximum sentence is 25 years' imprisonment. In addition, defendant is subject to a total maximum fine of $350,000, or twice the gross gain or gross loss resulting from the offenses of conviction, whichever is greater, mandatory costs of prosecution, a period of supervised release, and special assessments totaling $200, in addition to any restitution ordered by the Court.

## Sentencing Guidelines Calculations

8. Defendant understands that, in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that

range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

9. For purposes of calculating the Sentencing Guidelines, the government's position as of the date of this Agreement is as follows:

a. **Applicable Guidelines.** The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely, the November 1, 2025 Guidelines Manual.

b. **Offense Level Calculations.**

**Count Five and Relevant Conduct (Group One)**

i. The base offense level is 7, pursuant to Guideline § 2B1.1(a)(1)(B), because the offense of conviction has a statutory maximum term of imprisonment of 20 years or more.

ii. The offense level is increased by 18 levels, pursuant to Guideline § 2B1.1(b)(1)(I), because the loss amount (approximately $5,791,718.62) is greater than $3,500,000 but less than $9,500,000.

iii. The offense level is increased by 4 levels, pursuant to Guideline § 2B1.1(b)(2)(A), because the offense resulted in substantial financial hardship to five or more victims.

iv. The offense level is increased by 2 levels, pursuant to Guideline § 3C1.1, because defendant attempted to obstruct or impede the administration of justice with respect to the investigation and the obstructive conduct related to relevant conduct to defendant's offense of conviction.

**Count Nine and Relevant Conduct (Group Two)**

v. The base offense level is 22, pursuant to Guidelines §§ 2T1.1(a)(1) and 2T4.1(I), because the total federal and state tax loss ($3,303,442), is more than $1,500,000 but less than $3,500,000.

vi. The offense level is increased by 2 levels, pursuant to Guideline § 2T1.1(b)(1), because defendant failed to report income exceeding $10,000 in any year from criminal activity.

vii. The offense level is increased by 2 levels, pursuant to Guideline § 2T1.1(b)(2), because the offense involved sophisticated means.

**Grouping**

viii. Pursuant to Guideline § 3D1.2, Groups One and Two each form a separate group. Pursuant to Guideline § 3D1.4(a), Group One, which has an offense level of 31, is one Unit, and Group Two, which has an offense level of 26, is one-half Unit because the offense level for Group Two is 5 to 8 levels less serious than the offense level for Group One. Pursuant to Guideline § 3D1.4, with one and a half Units, 1 level is added to the group with the highest offense level (Group One), for a total offense level of 32.

c. **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal 9 and defendant's criminal history category is IV:

i. On or about December 13, 2004, defendant was convicted of trespassing and disorderly conduct in the District Court of Suffolk County, Massachusetts, and sentenced to 10 hours of community service. Pursuant to Guideline §§ 4A1.2(c)(1) and (e)(3), defendant receives zero criminal history points for these sentences.

ii. On or about March 27, 2008, defendant was convicted of bribery in Superior Court of Kings County, New York in Case No. 20077NY022282, and, on April 30, 2008, was sentenced to a term of imprisonment of two to six years to

run concurrent to the sentence in Case No. 06076-2007. Defendant was released from custody on or about May 22, 2012. Pursuant to Guideline §§ 4A1.1(a) and 4A1.2(e)(1), defendant receives three criminal history points for this sentence because the sentence exceeded one year and one month and defendant was incarcerated during part of the fifteen-year period within defendant's commencement of the instant offense.

iii. On or about March 27, 2008, defendant was convicted of 2 counts of identity theft, 2 counts of criminal possession of stolen property, a scheme to defraud, and grand larceny in Case No. 06076-2007 in Superior Court of Kings County, New York, and, on April 30, 2008, was sentenced to a term of imprisonment of two to six years to run concurrent to defendant's sentence in in Case No. 20077NY022282. Defendant was released from custody on or about May 22, 2012. Pursuant to Guideline §§ 4A1.1(a) and 4A1.2(e)(1), defendant receives three criminal history points for this sentence because the sentence exceeded one year and one month and defendant was incarcerated during part of the fifteen-year period within defendant's commencement of the instant offense and, pursuant to Guideline § 4A1.2(e)(2), the sentences are not treated as a single sentence because there was an intervening arrest.

iv. On or about January 30, 2026, defendant was convicted of attempting to collect on an extension of credit through extortionate means and punishment for nonrepayment of a debt in Case No. 24 CR 550 in the United States District Court for the Northern District of Illinois, and on or about June 30, 2026, defendant was sentenced to a term of imprisonment of 78 months. Pursuant to Guideline § 4A1.1(a), defendant receives three criminal history points for this sentence.

d. **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the government anticipates the offense level to be 32 which, when combined with the anticipated criminal history category of IV, results in an anticipated advisory sentencing guidelines range of 168 to 210 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

e. Defendant and his attorney and the government acknowledge that the guidelines calculations set forth in this Agreement are preliminary in nature and are non-binding predictions upon which neither party is entitled to rely. Defendant understands the above calculations are based on information now known to the government and that further review of the facts or applicable legal principles may lead the government to change its position on the guidelines calculations. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the defendant's, the probation officer's, or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of a change in the government's position on the guideline calculations or the Court's rejection of these calculations.

10. Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by the government prior to sentencing. The

government may correct these errors by a statement to the Probation Office or the Court, setting forth any changes in the government's position regarding the guidelines calculations. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea on the basis of such corrections.

**Agreements Relating to Sentencing**

11. This Agreement will be governed, in part, by Fed. R. Crim. P. 11(c)(1)(C). That is, the parties have agreed that, irrespective of the amount of any sentence imposed by the Court that runs concurrent to defendant's sentence in Case No. 24 CR 550, the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of at least twelve months and one day and not more than 42 months consecutive to the 78-month term of imprisonment imposed in Case No. 24 CR 550. Each party is free to recommend whatever sentence it deems appropriate within this range to run consecutively to the 78-month term of imprisonment imposed in Case No. 24 CR 550. Other than the agreed range of consecutive incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes a term of consecutive incarceration within the agreed range set forth herein, defendant may not withdraw this plea as a matter of right under Fed. R. Crim. P. 11(d) and (e). If, however, the Court refuses to impose a term of consecutive incarceration within the agreed range set forth herein, thereby rejecting this Agreement, or otherwise refuses to

accept defendant's plea of guilty, either party has the right to withdraw from this Agreement.

12. Regarding restitution, defendant acknowledges that the total amount of restitution owed to Victim E is $2,450,000, minus any credit for funds repaid prior to sentencing, and that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant to make full restitution in the amount outstanding at the time of sentencing.

13. Defendant agrees to pay restitution, pursuant to Title 18, United States Code, Sections 3663(a)(3) and 3664, to: (a) Individual H in the amount of $75,000; (b) Individual I in the amount of $75,000; (c) Individual J in the amount of $91,000; (d) Individual K in the amount of $250,000; (e) Individual L in the amount of $2,850,718.62; (f) the United States Treasury, arising from the offense conduct and relevant conduct set forth above in Count Nine, in the amount of $2,889,682; and (g) IDOR, arising from the offense conduct and relevant conduct set forth above in Count Nine, in the amount of at least approximately $413,760.

14. Restitution shall be due immediately and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

15. Defendant agrees to pay the special assessment of $200 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

16. Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), and Title 31, United States Code, Sections 3711, 3716, and 3728, notwithstanding any payment schedule set by the Court. In the event of the death or dissolution of, or the government's inability to locate the named recipient(s) of restitution in the Judgment and Commitment Order, the defendant agrees to not oppose efforts by the government to obtain an order substituting as payee a representative of the victim's estate, another family member, or any other person or successor entity appointed as suitable by the court, or the Crime Victims Fund.

17. After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the second superseding indictment, as well as the superseding indictment and indictment as to defendant.

**Forfeiture**

18. Defendant understands that, by pleading guilty, he will subject to forfeiture to the United States all right, title, and interest that he has in any property constituting or derived from proceeds obtained, directly or indirectly, as a result of the offense.

19. Defendant agrees to forfeiture of the following specific property to the United States: (1) the homes, garages, and structures located at 16011, 16031, and 16055 135th Street, Lemont, Illinois; (2) a Breitling Navitimer B01 Chronograph 41 watch, bearing serial number 3387052; (3) a Breitling Top Time B21 Ford Mustang watch, bearing serial number 7338319; and (4) approximately $120,000 seized by law enforcement officials from 32 Laight Street, Unit 5, New York, New York on or about December 18, 2024, and 3501 Meadow Drive, Michigan City, Indiana on or about January 18, 2025. In doing so, defendant admits that the property described above represents proceeds defendant obtained as a result of the offense in Count Five and the relevant conduct discussed above, as alleged in the second superseding indictment. Defendant consents to the immediate entry of a preliminary order of forfeiture as to this specific property, thereby extinguishing any right, title, or interest defendant has in it. If any of the specific property is not yet in the custody of the United States, defendant agrees to seizure of that property so that it may be disposed of according to law.

20. Defendant acknowledges that on or about February 7, 2025, administrative forfeiture proceedings were commenced against certain property, including $120,000, which was seized from the New York Residence on or about December 18, 2024, and FAKROUNE's residence in Michigan City, Indiana on or about January 18, 2025. By signing this plea agreement, defendant acknowledges that he had notice of the administrative forfeiture proceeding, relinquishes any right, title, and interest he may have had in this property, withdraws any previously filed claims, and

understands that an administrative decree of forfeiture has been entered, or will be entered, thereby extinguishing any claim he may have had in the seized property.

21. Defendant understands that forfeiture shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment. In this case, however, the United States Attorney's Office will recommend to the Attorney General that any net proceeds derived from any forfeited assets be remitted or restored to eligible victims of the offense pursuant to Title 18, United States Code, Section 981(e), Title 28, Code of Federal Regulations, Part 9, and other applicable law.

22. Defendant agrees to waive all constitutional, statutory, and equitable challenges in any manner, including but not limited to direct appeal or a motion brought under Title 28, United States Code, Section 2255, to any forfeiture and/or abandonment carried out in accordance with this agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel. Defendant further agrees not to challenge or seek review of the civil or administrative forfeiture of any property identified in this agreement subject to forfeiture or abandonment and will not assist any third party with regard to such challenge or review.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

23. This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 25 CR 512.

24. This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

25. Defendant understands that nothing in this Agreement shall limit the Internal Revenue Service in its collection of any taxes, interest or penalties from defendant. Defendant understands that the amount of tax as calculated by the IRS may exceed the amount of tax due as calculated for the criminal case.

### Waiver of Rights

26. Defendant understands that, by pleading guilty, he surrenders certain rights, including the following:

a. **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the superseding indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering

each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v. At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi. At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii. At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

viii. With respect to forfeiture, defendant understands that if the case were tried before a jury, he would have a right to retain the jury to determine whether the government had established the requisite nexus between defendant's offense and any specific property alleged to be subject to forfeiture.

b. **Waiver of appellate and collateral rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the

right to appeal his conviction and the sentence imposed. Acknowledging this, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, in exchange for the concessions made by the United States in this Agreement. Defendant further agrees to dismiss any filed appeal in Case No. 24 CR 550 and knowingly waives the right to appeal his conviction in that case, any pre-trial rulings by the court in that case, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, in exchange for the concessions made by the United States in this Agreement. In addition, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255 in the present case and Case No. 24 CR 550. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

27. Defendant understands that, by pleading guilty, he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights

specifically preserved above. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

**Presentence Investigation Report/Post-Sentence Supervision**

28. Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall endeavor to ensure that the relevant facts and sentencing factors, as applied to the facts, are brought to the District Court's attention fully and accurately, including facts related to the defendant's criminal conduct and related conduct, and any relevant information concerning the defendant's background, character, and conduct that the District Court may consider under 18 U.S.C. § 3661 in imposing a sentence.

29. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the Court.

30. For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

31. Defendant agrees to cooperate with the United States Attorney's Office in collecting any ordered fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

32. Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including one or more offenses to which defendant is pleading guilty. Indeed, because defendant is pleading guilty to an offense that is an "aggravated felony" as that term is defined in Title 8, United States Code, Section 1101(a)(43), removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding,

however, and defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his guilty plea may entail, even if the consequence is his automatic removal from the United States.

## Conclusion

33. Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

34. Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

35. Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

36. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

37. Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 9/3/26

RICK YOUNG Digitally signed by RICK YOUNG Date: 2026.09.02 08:25:48 -05'00'

ANDREW S. BOUTROS
United States Attorney

RICHARD M. ROTHBLATT
SEAN HENNESSY
Assistant United States Attorneys

JAWAD FAKROUNE
Defendant

BROOKE STEVENS
GLENN SEIDEN
Attorneys for Defendant